

**FILED**

Jun 30 2015, 7:55 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

| | |
|---|---|
| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| Kevin Wild<br>Indianapolis, Indiana | Gregory F. Zoeller<br>Attorney General of Indiana<br><br>Lyubov Gore<br>Deputy Attorney General<br>Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Scott Grundy,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | June 30, 2015<br><br>Court of Appeals Case No.<br>49A02-1409-CR-665<br><br>Appeal from the Marion Superior<br>Court<br><br>The Honorable Kurt Eisgruber, Judge<br>The Honorable Steven J. Rubick,<br>Magistrate<br><br>Cause No. 49G01-1401-FC-1983 |

**Najam, Judge.**

## Statement of the Case

[1]     Scott Grundy appeals his conviction for Aggravated Battery, a Class B felony, and his habitual offender adjudication. Grundy presents three issues for our review, which we revise and restate as:

1.  Whether the State presented sufficient evidence to support his conviction.

2.  Whether his sentence is inappropriate in light of the nature of the offense and his character.

3.  Whether the trial court erred when it enhanced his sentence under the prior version of the habitual offender statute.

We affirm Grundy's conviction and his sentence, and we hold that the July 1, 2014, revisions to the habitual offender statute, Indiana Code Section 35-50-2-8, do not apply retroactively to offenses committed prior to the effective date of our new criminal code.

## Facts and Procedural History

In August 2012, Grundy began a romantic relationship with Jennifer Smith, which lasted for more than a year. Because of Grundy's alcoholism and substance abuse, however, the two separated and reconciled frequently, and the couple's relationship was often tumultuous. Indeed, between April and late December 2013, more than ten police reports resulted from Grundy's relationship with Smith.

In December 2013, Smith was employed at Covance in Indianapolis, and, on December 28, Smith agreed to give two of her coworkers, Tonya Hardin and Fu Chia Tsai, a ride home after their shift ended at 7:00 p.m. The three's relationship was strictly professional; none associated outside of work. At approximately 7:00 p.m., Smith, Hardin, and Tsai exited the building together and walked to Smith's vehicle, and, when they approached, they noticed that

someone had broken Smith's windshield wipers. Smith immediately suspected Grundy, who had sent Smith argumentative text messages earlier in the day, to which Smith did not respond.

[5] As the three observed the damage to Smith's car, Grundy drove his vehicle[1] from a nearby road, across a grassy area adjacent to the parking lot at Covance, and over some shrubbery that divided the parking lot from the grassy area. Grundy sped towards Smith, Hardin, and Tsai, and, when he got close to where the three were standing, Grundy exited the vehicle and aggressively approached Tsai. As Grundy walked towards Tsai, Grundy asked Tsai who he was and about the status of his relationship with Smith. When Tsai answered that he was Smith's coworker, Grundy responded, "Co-worker my ass." Tr. at 13. Grundy then charged Tsai and punched him once in the face, which knocked Tsai to the ground. Once down, Grundy delivered a kick to Tsai's face. Grundy immediately returned to his vehicle and fled. Tsai remained conscious but went into shock and lost memory for ten seconds after the attack.[2]

[6] After the attack, Smith ran to the security desk at Covance and reported to the acting security guard, Daniel Osborne, that Grundy had attacked Tsai. Osborne called the police, and Officer Eric Walker with the Indianapolis Metropolitan Police Department responded to Osborne's call. Officer Walker actually knew Tsai personally, but, when he arrived, Officer Walker did not

---

[1] At the time, Grundy's license was suspended as the result of a DUI conviction.

[2] Tsai remembers being punched and kicked but nothing else about the assault or its immediate aftermath.

recognize him because of the severe injuries to Tsai's face. Smith identified Grundy to Officer Walker as Tsai's assailant.

[7] Because of his injuries, Tsai was transported to the hospital where he discovered that Grundy had broken six of the seven bones in his right eye socket, fractured his right cheek bone, and broken his nose in two places. Tsai's cheek was "significantly flattened," and, at the hospital, he had double vision, blurred vision, and trouble breathing. State's Ex. 17. Tsai was treated and released.

[8] On January 13, 2014, the hospital referred Tsai to Dr. Hu Bai Harold Lee, an oculoplastic surgeon who specializes in reconstructive surgery, but, due to swelling in Tsai's face, Dr. Lee could not operate until January 21, 2014. In the interim, Tsai continued to have difficulty chewing and breathing,[3] and he suffered headaches almost daily, which disrupted his sleep. As a result of his injuries, Tsai could not read. When Dr. Lee was able to operate on Tsai on January 21, to reconstruct Tsai's face, he placed three permanent titanium plates with metal screws into Tsai's eye socket, and he also fitted a permanent, plastic implant into Tsai's eye socket. The plates, screws, and implant restored the bones in Tsai's face to their anatomically correct positions, and they corrected his double and blurred vision, which would have persisted absent the surgery. Tsai's vision prescription, however, changed, and the surgery

---

[3] Tsai could not breathe out of his nose for approximately four months after the attack, which, in turn, damaged his ribs. The injury to Tsai's ribs required physical therapy.

permanently left Tsai with scarring and a droopy eyelid. Moreover, because the attack damaged a prominent nerve in Tsai's eye socket, which provides sensation to the cheek, Tsai now has permanent numbness in the right side of his face.

[9] On January 15, 2014, the State charged Grundy by information with one count of battery, as a Class C felony, and, on February 4, the State amended its charging information to include one count of aggravated battery, a class B felony. Thereafter, Grundy moved for a speedy trial, which the trial court granted on June 9, and the State filed its habitual offender information on June 10.[4]

[10] While Grundy awaited trial in the Marion County Jail, he called his uncle, Gerald Grundy ("Uncle Gerry"), who questioned Grundy about his crime. In response, Grundy explained:

> [Grundy]: . . . [W]hen two people [are] in a fight[,] how hard are [they] supposed to fight[?] I hit the guy one time[,] kicked him one time[;] that was it.
>
> * * *
>
> [Grundy]: [H]ow bad is serious bodily injury? I mean . . . they have the video and all that. And allegedly I did all this stuff. That's how we talk on the phone. But even if the video was to reflect anything[,] it would allegedly show somebody getting punched one time and getting kicked one time and that's it[.]

---

[4] The State filed its Notice of Intent to File Habitual Offender Enhancement on January 29, 2014.

* * *

[Uncle Gerry]:  You hit him a couple times?

* * *

[Grundy]:  Yeah[,] just tunin[g] somebody up a little bit for me[dd]lin[g].  And that was it. . . .

[Uncle Gerry]:  [O]h[,] he was . . . me[dd]lin[g] with you and Jenny . . . ?

[Grundy]:  Yeah . . . but I'm not gonna be rappin[g] on no phone [be]cause they record all this stuff.

* * *

[Grundy]:  . . . [I]t's not that bad[,] man[.]  I mean[,] it's a fight[.  T]here's no question it's a fight[.  S]omebody got f[*****] up.  In fights[,] people get f[*****] up.

* * *

[Grundy]:  [T]hat's the bottom line[.  W]hat do you do[,] rub a feather across somebody's face that you fightin[g]?  Never heard of that one.

State's Ex. 19.

[11]  On July 24, just before trial and again from jail, Grundy sent a letter to Smith in which he told her that she should not come to trial to testify against him.  After he professed his love to Smith, Grundy wrote:

. . . If you show-up [sic] you will make yourself apart [sic] of an epic event[.  O]ne side will try to break you down[,] and so will the other, and it will take its toll[.  A]nd neither side will have compassion for your well[-]being, because both side[s] will be trying to win at your expense, [sic] (simple and plain)!

Beside[s] all that[,] what I am trying to say to you is it will not matter what you say for me or against me[.  It] will not make that much difference that day, and why are you so gun hoe [sic] on [testifying] when the others have chosen not too [sic]?

Basically[,] you are the only one tripping over all this[.  Y]ou know who has made it clear they are not coming, so why have you made it clear to my Uncle [sic] that you are?

Babe[,] you know what is at stake with me should you act like that[.  Y]ou are not my Orangie[;] you can not [sic] help me that day[,] and I am telling you not to come period!  With the only acception [sic] to this is [sic] that you are told by my folks too [sic].  You are not going to play another role in ruining my life.

If you need to do anything[,] the only right thing is to be on my side or stay away from all this.  I see it has taken a serious toll on you and your thinking and judgment.  So allow me to reassure you that all will be well if you listen and follow the instruction of our team, and stay out of it[.  Y]ou are in way over your head!

State's Ex. 15.

[12] The trial court held Grundy's bench trial on August 13.  At the trial, Tsai testified that, in addition to the permanent numbness in his face, he continued to have headaches almost daily, which affect his sleep, and issues with his neck.  Further, he testified that he still has trouble with the functioning of his right eye.  At the conclusion of the trial, the court convicted Grundy of aggravated battery,

a Class B felony, and "merge[d]" the battery charge, as a Class C felony, into the aggravated battery conviction. Tr. at 119.

[13] Grundy's habitual offender determination and sentencing hearing were held on August 26. At the hearing, Grundy did not contest that he was a habitual offender, and he stipulated to the admission of his prior convictions. Thus, the trial court adjudicated Grundy a habitual offender and proceeded to the sentencing phase of the hearing, during which Grundy offered in mitigation: (1) his alcoholism and substance abuse; (2) his participation in Alcoholics Anonymous and Narcotics Anonymous classes while incarcerated; (3) his role as a caregiver to elderly family members who depend on him; and (4) his expression of remorse for the injuries his attack inflicted on Tsai. At the conclusion of the sentencing hearing, the court sentenced Grundy to ten years in the Indiana Department of Correction for the aggravated battery, the advisory sentence for a Class B felony, which the court enhanced by another ten years, the minimum allowed under the habitual offender statute as it existed before the revisions to our criminal code took effect on July 1, 2014. The court enhanced Grundy's sentence by only ten years because it believed that Grundy was not "the worst of the worst" habitual offenders. *Id.* at 177. The trial court suspended two years of Grundy's sentence to probation.

[14] In support of the sentence imposed, the trial court stated:

> [W]hat your history has shown me is that you don't learn from
> your mistakes despite ample opportunities . . . . [W]henever you
> talked about this particular incident[,] you kept saying[,] "I

wouldn't do it if I were not under the influence of drugs or alcohol." . . . [B]ut if you want me to believe you and believe the remorse that you said[,] you don't get to say[,] "I wouldn't have done this if." You simply have to say[,] "I did it—I was wrong." You don't put that distance between yourself and the act by claiming that you were under the influence at the time because that undercuts every statement of remorse you're making to me. If you [were] wrong, admit you were wrong[;] don't qualify it.

* * *

[T]he State[,] today[,] has requested a [thirty-five-]year sentence. I do not find that a [thirty-five-] year sentence is appropriate . . . . [B]ut I also don't believe that the State's last [plea] offer [of a twelve-year sentence] is sufficient. Having heard all of the evidence and having considered everything put forth today[, twelve years] is far too low, [thirty-five] is far too much . . . .

In mitigation[,] though[,] Mr. Grundy took this case to trial[.] I still find he is due some mitigating weight having essentially accepted his status as a habitual offender. . . . Mr. Grundy has a remarkable family. . . . [I]t goes to your credit, Mr. Grundy, that the older members of your family rely on you as heavily as they do[,] so I'm affording some mitigating weight for that and some mitigating weight for the hardship that will be visited on your family by virtue of your impending incarceration. I will also give you some mitigating weight for your history of substance abuse. Your criminal history reflects [seventeen] alcohol and drug related arrests. One is too many. [Seventeen] is far too many[,] so you clearly have a problem, Mr. Grundy[,] but the weight that I give to that—the mitigating weight I give to that is tempered by the virtue of the number of opportunities that you've had to correct your behavior.

In aggravation . . . your criminal history is something that cannot be overlooked. You have had [thirty-nine] total arrests, . . .

[twelve] misdemeanor convictions, three felonies—again, [seventeen] alcohol or drug related offenses[,] though not all [of] those have resulted in a conviction. The ones today that interest me the most and concern me the most are the battery conviction you had in 1991 . . . , your battery conviction in 2000 . . . , your second felony conviction for battery in 2009 . . . , the invasion of privacy charge from 2010 . . . [,] and your 2013 battery conviction . . . . Those are the convictions that have an element of violence and they show me that over the last [twenty-three] years[,] your propensity toward anger and violence has not lessened. I'm also more than a little troubled by the gun that you have tattooed on your shoulder . . . . [T]o have a gun tattooed on your shoulder glorifies violence. . . . [I]t speaks to something in your character that is concerning. I also have to give aggravating weight to . . . the effect this crime had on your victim. . . . When the structure of a person's face is surgically changed[,] it changes that person forever. . . . [I]t was such a permanent change and his fear is such that he has had to leave this country[;[5]] that's pretty significant.

You submitted to the Court a number of certificates that you accumulated while you were awaiting trial and ask for mitigating weight to be afforded that[,] but that's counter-balanced by your efforts while incarcerated to influence the witnesses in this case. There's no question the letter that you sent . . . was an effort to influence her. It was manipulative. . . . [T]here's no question that you were attempting to influence your ex, attempting to convince her not to come to trial or her life would be changed[,] and she would be denied the love and support of your family[. T]hat was devious . . . and troubling.

Lastly[,] in the telephone call that was played during the trial[,] you tried to explain away your actions characterizing it as just a

---

[5] At some point after Grundy's trial but before sentencing, Tsai told the prosecutor that he was returning to his native Taiwan because he no longer felt safe in the United States.

fight—that is was tuning up a guy for [meddling,] but this was not a fight[;] this was an attack. Mr. Tsai was not involved beyond being on the receiving end of a devastating punch[,] and when he fell to his knees defenseless[,] you kicked him in the head. That was an attack[. I]t was unprovoked[ and] irrationally violent[,] so coming here today and accepting responsibility and making a statement of remorse in an effort to remove some of the sting rings a bit hollow, Mr. Grundy.

*Id.* at 170-76 (quotation marks and paragraph structure supplied). This appeal ensued.

# Discussion and Decision

## *Issue One: Sufficiency of the Evidence*

[1] Grundy first contends that the State presented insufficient evidence to convict him of aggravated battery. Our standard of review for sufficiency of the evidence claims is well-settled. *Tobar v. State*, 740 N.E.2d 109, 111 (Ind. 2000).

> In reviewing the sufficiency of the evidence, we examine only the probative evidence and reasonable inferences that support the verdict. We do not assess witness credibility, nor do we reweigh the evidence to determine if it was sufficient to support a conviction. Under our appellate system, those roles are reserved for the finder of fact. Instead, we consider only the evidence most favorable to the trial court ruling and affirm the conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt.

*Pillow v. State*, 986 N.E.2d 343, 344 (Ind. Ct. App. 2013) (citations and quotation marks omitted).

[2] To prove that Grundy committed aggravated battery, as charged, the State had to demonstrate that he knowingly or intentionally inflicted injury on Tsai that caused "protracted loss or impairment of the function of a bodily member or organ." Ind. Code § 35-42-2-1.5(2). We have previously observed "that 'protracted' means to 'draw out or lengthen in time,' and that 'impairment' means the 'fact or state of being damaged, weakened, or diminished.'" *Mann v. State*, 895 N.E.2d 119, 122 (Ind. Ct. App. 2008) (citations omitted). Expert testimony is not required to prove that a victim suffered a protracted impairment. *Id.*

[3] Grundy concedes that Tsai suffered serious injuries, which is sufficient to support a conviction for battery, as a Class C felony. *See* I.C. § 35-42-2-1(a)(3). However, Grundy asserts that the evidence failed to demonstrate that Tsai suffered "protracted loss or impairment of the function" of his eye, which is necessary to support a conviction for aggravated battery. I.C. § 35-42-2-1.5(2). Instead, Grundy argues that, at the time of his trial, Tsai benefitted from the full functionality of his right eye.

[4] In support of this argument, Grundy acknowledges that, in addition to permanent numbness and scarring, Tsai continued to have headaches and neck problems. However, he points out that Tsai did not lose consciousness during or after the attack and that Dr. Lee testified that Tsai's surgery "was successful in restoring Tsai's function back to his baseline level." Appellant's Br. at 12. But it is apparent that Grundy's argument on appeal is merely a request that we reweigh the evidence, which will not do. *See Pillow*, 986 N.E.2d at 344. The

evidence most favorable to the judgment establishes that, beyond protracted loss or impairment, Grundy's attack left Tsai with permanent numbness, permanent scarring, and degraded vision in his right eye. Further, more than six months after the attack, Tsai continued to suffer from headaches, neck pain, and loss of sleep. This evidence is sufficient to demonstrate protracted loss or impairment and, therefore, to support Grundy's conviction. *See, e.g.*, *Fleming v. State*, 833 N.E.2d 84 at 90 (Ind. Ct. App. 2005) (distinguishing *Neville*).

[5]     In his attempt to argue that the evidence was insufficient to convict him of aggravated battery, Grundy also attempts to analogize the injuries inflicted in this case to those suffered by the victims in *Neville v. State*, 802 N.E.2d 516 (Ind. Ct. App. 2004), *trans. denied*, and *Salone v. State*, 652 N.E.2d 552 (Ind. Ct. App. 1995), *trans. denied*, where we held that the evidence was insufficient to sustain the convictions for aggravated battery therein.[6] However, those cases do not stand for the proposition that Grundy ascribes to them. In both cases, the prosecution failed to offer any evidence regarding the "severity or duration of functional impairment caused by the victim's burns." *Neville*, 802 N.E.2d at 519 (discussing *Salone*, 652 N.E.2d at 559). The prosecutors in *Neville* and *Salone* left proof of protracted loss or impairment solely to an inference drawn by the factfinder "as a matter of common knowledge" that the injuries "resulted in protracted loss or impairment." *Id.* In contrast, here, the State offered

---

[6] In *Salone*, Salone was convicted of two counts of aggravated battery that corresponded to injuries inflicted on two separate victims. We affirmed one of his convictions and reversed the other. 652 N.E.2d at 559-60.

testimony from both Tsai and Dr. Lee that Tsai's injuries were severe, long-lasting, and, to some extent, permanent.

### *Issue Two: Sentence*

[6] Next, Grundy asserts that his aggregate twenty-year sentence is inappropriate in light of the nature of the offense and his character, and, as such, he requests that we revise his sentence downward. Article 7, Sections 4 and 6 of the Indiana Constitution "authorize[] independent appellate review and revision of a sentence imposed by the trial court." *Roush v. State*, 875 N.E.2d 801, 812 (Ind. Ct. App. 2007) (alteration in original). This appellate authority is implemented through Indiana Appellate Rule 7(B). *Id.* Revision of a sentence under Rule 7(B) requires the appellant to demonstrate that his sentence is inappropriate in light of the nature of his offenses and his character. Ind. Appellate Rule 7(B); *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). We assess the trial court's recognition or non-recognition of aggravators and mitigators as an initial guide to determining whether the sentence imposed was inappropriate. *Gibson v. State*, 856 N.E.2d 142, 147 (Ind. Ct. App. 2006). However, "a defendant must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review." *Roush*, 875 N.E.2d at 812 (alteration original).

[7] Indiana's flexible sentencing scheme allows trial courts to tailor an appropriate sentence to the circumstances presented, and the trial court's judgment "should receive considerable deference." *Cardwell v. State*, 895 N.E.2d 1219, 1222, 1224 (Ind. 2008). The principal role of appellate review is to attempt to "leaven the

outliers." *Id.* at 1225. Whether we regard a sentence as inappropriate at the end of the day turns on "our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other facts that come to light in a given case." *Id.* at 1224.

[8] With regard to the nature of the offense, Grundy characterizes his crime as "a one-punch, one-kick moment of alcohol-influenced senselessness," which, he argues, was "not unusually severe." Appellant's Br. at 14. Further, Grundy contends that his sentence is inappropriate because Tsai "made a full functional recovery." *Id.* at 15. However, this is not how the trial court described Grundy's attack. In contrast to Grundy's assessment of his crime, the trial court called his crime a "devastating," "unprovoked," and "irrationally violent" attack on a "defenseless" victim. Tr. at 176. We agree with the trial court. Grundy viciously assailed Tsai and later downplayed the severity of his crime to his uncle. Tsai suffered permanent injuries and now feels unsafe in the United States. The nature of the offense supports Grundy's sentence.

[9] Grundy's character also supports his sentence. As the trial court found, Grundy has a substantial criminal history, which includes several other convictions for battery. A number of his convictions are felonies, and, significantly, Grundy was on probation and drove on a suspended license when he attacked Tsai. Finally, Grundy attempted to manipulate Smith to keep her from testifying against him. Thus, we also hold that Grundy's sentence is not inappropriate in light of his character.

### *Issue Three: Habitual Offender Statute*

Last, Grundy contends that the trial court erred when it sentenced him pursuant to the habitual offender statute in effect prior to July 1, 2014. He asserts that, instead, the trial court should have sentenced him pursuant to the amended habitual offender statute, which went into effect on July 1, 2014. Grundy's challenge presents a question of law, which we review de novo. *State v. Moss-Dwyer*, 686 N.E.2d 109, 110 (Ind. 1997).

Prior to July 1, 2014, Indiana's habitual offender statute provided:

> The court shall sentence a person found to be a habitual offender to an additional fixed term that is not less than the advisory sentence for the underlying offense nor more than three (3) times the advisory sentence for the underlying offense. However, the additional sentence may not exceed thirty (30) years.

I.C. § 35-50-2-8(h) (2013). That statute now states:

> The court shall sentence a person found to be a habitual offender to an additional fixed term that is between:
>
> > six (6) years and twenty (20) years, for a person convicted of murder or a Level 1 through Level 4 felony[.]

Ind. Code § 35-50-2-8(i)(1) (2014). Had Grundy committed his offense after July 1, 2014, his aggravated battery conviction would be a Level 3 felony. *See* I.C. § 35-42-2-1.5 (2014).

[12] When the legislature enacted the new criminal code, it did so alongside a general savings statute. That statute provides that the revisions to the criminal code do not affect "(1) penalties incurred; (2) crimes committed; or (3) proceedings begun" before those revisions took effect. I.C. § 1-1-5.5-21(a) (2014). Further, the savings clause specifies that "[t]he general assembly does not intend the doctrine of amelioration to apply."[7] I.C. § 1-1-5.5-21(b) (2014).

[13] Grundy contends that the general savings clause does not apply to habitual offender determinations and, thus, that he should have benefitted from the reduced enhancement provided for in the new habitual offender statute. Specifically, Grundy asserts that "habitual offender" is a status, not a separate crime, and that he obtained habitual offender status on August 26, 2014, after the effective date of the revisions to our criminal code. Therefore, he reasons: (1) "[t]here were no crimes committed prior to July 1, 2014"; (2) "[t]here were no habitual offender penalties incurred prior to July 1, 2014"; and (3) "[t]here were no proceedings begun on the habitual offender status because no proceedings can begin until the underlying felony conviction[, which was entered on August 13, 2014,] is in place." Appellant's Br. at 19.

[14] Grundy concludes that "a person cannot have the status of being a habitual offender unless and *until* he has been convicted of the underlying felony." *Id.* (emphasis in original). Consequently, because the trial court wished to

---

[7] Where no savings clause exists, the doctrine of amelioration allows a court to apply an ameliorative amendment made to a sentencing statute "to all those sentenced after [the statute's] effective date." *Hooker v. State*, 799 N.E.2d 561, 575 (Ind. Ct. App. 2003), *trans. denied*.

sentence him to the minimum enhancement allowed under the habitual offender statute, Grundy asserts that, had the court properly sentenced him under the revised statute, he would have only received a six-year enhancement and not the ten-year enhancement that he actually received.

[15] While we acknowledge the creativity of Grundy's argument, we disagree with his ultimate conclusion. Although Grundy is correct that a habitual offender status "is not a separate crime," nevertheless, that status is attached to the underlying crime. *See Baurer v. State*, 875 N.E.2d 744, 747 (Ind. Ct. App. 2007), *trans. denied*. As we stated in *Baurer*, a habitual offender finding is "an enhancement of the sentence *for the underlying crime to which it is attached*." *Id.* (emphasis supplied). And it is well settled that "the sentencing statutes in effect at the time the defendant committed the offense govern the defendant's sentence." *Marley, v State*, 17 N.E.3d 335, 340 (Ind. Ct. App 2014), *trans. denied*. As a panel of this court recently stated, "[t]he time of a crime is selected as an act of free will by the offender, and, thus, it is the criminal, not the State, that chooses which statute applies to his or her offense." *Whittaker v. State*, ___ N.E.3d ___, 2015 WL 2405590, at *2 (Ind. Ct. App. May 20, 2015), *not yet certified*; *see also Bell v. State*, 654 N.E.2d 856, 858 (Ind. Ct. App. 1995).

[16] Therefore, although Grundy was not adjudicated a habitual offender until August 26, 2014, his status as such is inextricably attached to the date he committed the underlying crime, which was on December 28, 2013, well before the effective date of the revisions to our criminal code. And, again, "the law in effect when the crime was committed controls sentencing." *Riffe v. State*, 675

N.E.2d 710, 712 (Ind. Ct. App. 1996), *trans. denied*. The legislature acknowledged as much when it enacted a general savings clause that states that the revisions to the criminal code do not apply to crimes committed before the effective date of those revisions, through the doctrine of amelioration or otherwise. *See Marley*, 17 N.E.3d at 340 ("It is abundantly clear . . . that the General Assembly intended the new criminal code to have no effect on criminal proceedings for offenses committed prior to the enactment of the new code."), *trans. denied*. We, therefore, hold that the trial court did not err when it enhanced Grundy's sentence pursuant to the habitual offender statute in effect prior to July 1, 2014.

## Conclusion

[17] In sum, we hold that sufficient evidence supports Grundy's conviction for aggravated battery. Further, we hold that the trial court did not err when it sentenced Grundy or when it enhanced his sentence pursuant to the habitual offender statute in effect prior to July 1, 2014.

[18] Affirmed.

Baker, J., and Friedlander, J., concur.