## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 25 2017, 5:37 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Amy Karozos
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| H.J.,<br>*Appellant-Defendant*,<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | July 25, 2017<br><br>Court of Appeals Case No.<br>49A02-1609-JV-2034<br><br>Appeal from the Marion Superior Court<br><br>The Honorable Marilyn Moores, Judge<br><br>The Honorable Geoffrey Gaither, Magistrate<br><br>Trial Court Cause No.<br>49D09-1602-JD-182 |

**Brown, Judge.**

[1] H.J. appeals his adjudication as a delinquent for committing acts that would constitute theft and auto theft as level 6 felonies if committed by an adult. H.J. raises two issues which we consolidate and restate as whether the evidence is sufficient to sustain his adjudication as a delinquent. We affirm.

## Facts and Procedural History

[2] On December 6, 2015, LaShawn Rogers parked in a gas station parking lot on 38th Street in Marion County and exited her Hyundai Santa Fe. Rogers observed two teenagers, a "guy and girl," the male juvenile of whom was H.J. born in September 2001, standing immediately in front of her vehicle as she pulled up and it looked to her like they were going to ask her for money. Transcript Volume II at 14. Rogers said "No, I don't have any money," and as she made the statement she stepped over the parking brick, fell, and "dropped everything" in her hand which included "the little punch thing that you lock the . . . car with." *Id.* at 13-14. Rogers started to pick everything up, "the gentlemen started to pick it up, too," and she thanked him, felt bad for having said that she did not have any cash, and went into the store. *Id.* at 14.

[3] When Rogers exited the station, she observed H.J. and the other juvenile in her vehicle, "they were backing out as [Rogers] was coming out of . . . the building," and H.J. was driving and the female juvenile was on the passenger side. *Id.* Rogers started yelling, said "[b]ring my truck back," ran to the corner, asked a person in another vehicle for help, and eventually went back to the gas station and called 911. *Id.* at 16. Rogers had left her laptop, purse, and a cell

phone in the vehicle. Rogers did not realize it at the time, but her "clicker" which unlocked the vehicle was missing. *Id.* The police took Rogers's statement and took her home. Days later, Rogers had her cell phone shut off and obtained a replacement phone. When she received the replacement she "uploaded . . . pictures and stuff from the cloud . . . to get what [she] had on the phone from the last time," and saw pictures of the individuals who had taken her vehicle. *Id.* at 17. Indianapolis Police Detective Kevin Kern investigated the case.

[4] On February 3, 2016, the State filed a petition alleging that H.J. had committed acts that, if committed by an adult, would constitute theft and auto theft as level 6 felonies. On May 4, 2016, H.J. filed a notice of alibi stating that he was at Incrediplex in Indianapolis at the time of the alleged event and that his cousin Dejuan Anderson dropped him "off at Incrediplex where he was at the time of the incident and then picked him up from Incrediplex." Appellant's Appendix Volume II at 67.

[5] On May 23, 2016, the court held a denial hearing at which it admitted into evidence the photographs which had been taken using Rogers's phone.[1] Rogers testified that, when she exited her vehicle at the gas station, "there were two teenagers standing, like, right in front of my car as I pulled up." Transcript Volume II at 13. She testified that, when she was picking up the items she

---

[1] The court held a joint denial hearing for H.J. and the female juvenile.

dropped when she fell, "the gentlemen started to pick it up, too, and I was like, 'Oh, thank you.'" *Id.* at 14. She further indicated that, when she exited the store, she "saw . . . the guy and the girl in [the] car, and they drove off. They were backing out as I was coming out of the . . . building." *Id.* Rogers then made an in-court identification of H.J. and the female juvenile and testified that H.J. was driving and the female was on the passenger side. When asked "how close were you to the car when it was leaving," Rogers testified "I'll say they were almost out of the parking lot, but not too far that I couldn't see their face," and when asked what time of day this occurred, she indicated "[i]t was probably about 4:45." *Id.* at 15. When asked "how good a look did you get of [H.J.] and [the other juvenile] when you fell," Rogers replied "I didn't look at 'em too much when I fell, but I saw 'em when I got out of the truck," and when asked "how far were you at that time," she answered "they were right in front of my truck." *Id.* at 15-16.

[6]     When asked "what happened days later," Rogers testified:

> Oh, um, days later, um, I shut my cell phone off, my personal cell phone off, and, um, when I got the replacement, um, I, you know, uploaded the cloud, um, pictures and stuff from the cloud, because you have to upload 'em to get what you had on the phone from last time, and I uploaded 'em and then I saw the pictures that the, uh, the two people on there, and I was like, "Oh my goodness, these are the guys that stole my truck." And there was more than, you know, two kids on there, but, um, I actually, um, asked friends and family if they knew who these kids were because I have [] nieces and nephews that are school-aged, and, and they actually told me who they were.

*Id.* at 17. Rogers indicated there were ten or twelve photos downloaded, and when asked how many kids were on those, she answered six or seven. The prosecutor showed her the State's exhibits containing photographs, and she indicated that she uploaded and printed the photographs and took them to a detective. When asked "why did you mark them," she answered "[b]ecause those are the two . . . defendants that took my vehicle," and when asked how she knew that, she answered "[b]ecause I saw 'em." *Id.* at 19. She also indicated there were not any other children at the gas station.

[7]     On cross-examination, Rogers indicated her vehicle and phone were never found, she did not pick the juveniles out of a lineup or give a sketch to the detective, she had to obtain assistance from friends and family to identify them, and that her Kroger card had been used by another individual, whose photo had been taken by a security camera, and she had never seen that individual before. She stated she showed her family members two pictures that were on the cloud, defense counsel for the female juvenile asked "[w]hy did you not show them the rest of the pictures," and Rogers replied "[b]ecause those . . . kids weren't involved." *Id.* at 26. When asked how her family members knew H.J. and the other juvenile, she stated they went to school with them.

[8]     When asked if he obtained video from the gas station, Detective Kern testified "the problem I always have with [the] gas station at 38th and Oxford is . . . that they maintain three days' worth of video, and they tape over it. . . . and I didn't get the case for several days." *Id.* at 43. H.J.'s defense counsel asked Detective Kern on cross-examination if he went to H.J.'s house and set up a recorder to

record H.J.'s statement, and he responded affirmatively. He indicated that he provided the recording to the prosecutor's office, and H.J.'s defense counsel asked for a recess and said that she had not been provided a copy of the recording. After a recess, H.J.'s defense counsel indicated that alibi witnesses were present and asked that the proceedings be bifurcated so that the witnesses could testify and then proceed after the recordings were received. The prosecutor stated that Detective Kern had the recordings and the State was not opposed to bifurcation to allow the defense to hear the recordings and ask Detective Kern any questions. The court indicated it would bifurcate the proceedings, permit defense counsel to present the testimony of the alibi witnesses, and then reschedule the matter to provide an opportunity to receive and review the recordings.

[9]     H.J.'s defense counsel resumed her cross-examination of Detective Kern and asked him if he had received information that H.J. was at Incrediplex on the day of the incident, and Detective Kern replied "[n]ot from him. Correct." *Id.* at 52. When asked if he went to Incrediplex to follow up on H.J.'s alibi, he responded "I did not." *Id.* Detective Kern indicated that H.J.'s mother called him after the initial interview and gave him more information and suggested there would be video at Incrediplex, and when asked "did you go seek that out," he replied "I did not." *Id.* He agreed that the only documentation he had been able to verify was H.J.'s picture downloaded by Rogers. He testified that the use of the Kroger card which had been attached to Rogers's keys occurred four months after the vehicle was stolen. When asked if he agreed that the

pictures were taken at the school, he answered that it appeared so. When asked if, in his training and experience, a business might keep video for ten or thirty days, Detective Kern replied "[i]t varies . . . correct." *Id.* at 69.

[10] H.J.'s defense counsel called DeJuan Anderson, H.J.'s cousin, as an alibi witness, and Anderson testified that he and H.J. attended church on the morning of December 6, 2016, after church they returned to H.J.'s house, at "like four, four forty-five" he left his house to drop off H.J. and three others at Incrediplex to play basketball, and it took "maybe twenty minutes" to travel from the house to Incrediplex. *Id.* at 91. Anderson testified that he traveled to a banquet at Lawrence North High School and then returned to Incrediplex to pick up H.J. and the others, that it would take at least twenty to thirty minutes to drive from Incrediplex to the gas station on 38th Street, and that to his knowledge H.J. does not know how to drive.

[11] Counsel for H.J. and the other juvenile moved to dismiss the case because the taped statements should have been given to them. The prosecutor noted that the State agreed to a bifurcation to give defense counsel the recorded statements and argued that the bifurcation and not a dismissal was the appropriate remedy. The court denied the request for dismissal and scheduled continued proceedings for June 28th.

[12] On June 28, 2016, the court held the scheduled hearing. Kathryn Box testified she was previously the lead deputy prosecutor on the cases, she had not received any audio records in this case, and she did not withhold them from the

defense. Amy McGrath testified she was an investigative paralegal with the Marion County Public Defender Agency, she went to Incrediplex on March 2nd to inquire about video and sign-in sheets, Incrediplex has video cameras, and that Incrediplex did not have any time sheets and was not able to provide any video, which she believed was because too much time had passed.

[13] H.J.'s counsel then continued her cross-examination of Detective Kern who indicated that he had previously stated he had provided audio records to the prosecutor's office, that he had not done so, and that there were nine recordings that he did not turn over. Detective Kern stated that he visited H.J.'s home, he wished to speak with H.J.'s mother, and that another man was present and attempted to discuss an alibi for H.J. When asked if the man and H.J.'s mother insisted H.J. was at Incrediplex, Detective Kern replied "I missed that when they initially said it." *Id.* at 122. After playing a portion of a recording, Detective Kern acknowledged that Anderson and H.J.'s mother each mentioned Incrediplex and that he did not conduct further interviews with Anderson. When asked if H.J.'s mother urged him to go to Incrediplex during a subsequent phone call, Detective Kern answered affirmatively and testified "[a]t that point, that was months after, or that was like a full month after the charges were already filed" and "I figured the defense would explore that." *Id.* at 124.

[14] In closing, the prosecutor argued that photographs taken using Rogers's stolen phone depicted H.J., that Rogers identified H.J. in the photographs as the person she observed drive away with her vehicle, and that the case was about

whether the court believed Rogers's testimony. H.J.'s defense counsel argued that H.J. "didn't get a fair shake with the detective," Rogers was shaken up on the day of the thefts, H.J. was not at the scene of the crime and provided an alibi, and the State could have preserved important video evidence. *Id.* at 143. The court took the case under consideration.

[15] On June 30, 2016, the court entered an order finding the allegations in the delinquency petition to be true. On August 15, 2016, it held a dispositional hearing and entered a dispositional order on delinquency which discharged H.J. to the custody of his father, placed him on standard conditions of probation, and scheduled a probation review hearing.

## *Discussion*

[16] The issue is whether the evidence is sufficient to sustain H.J.'s adjudication as a delinquent for committing acts that would constitute theft and auto theft as level 6 felonies if committed by an adult. When the State seeks to have a juvenile adjudicated as a delinquent for committing an act that would be a crime if committed by an adult, the State must prove every element of the crime beyond a reasonable doubt. *J.S. v. State*, 843 N.E.2d 1013, 1016 (Ind. Ct. App. 2006), *trans. denied.* In reviewing a juvenile adjudication, we will consider only the evidence and reasonable inferences supporting the judgment and will neither reweigh evidence nor judge the credibility of the witnesses. *Id.* If there is substantial evidence of probative value from which a reasonable trier of fact could conclude that the juvenile was guilty beyond a reasonable doubt, we will affirm the adjudication. *Id.* It is well established that circumstantial evidence

will be deemed sufficient if inferences may reasonably be drawn that enable the trier of fact to find the defendant guilty beyond a reasonable doubt. *Pratt v. State*, 744 N.E.2d 434, 437 (Ind. 2001).

[17] Ind. Code § 35-43-4-2 provided at the time of the offenses that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person, with intent to deprive the other person of any part of its value or use, commits theft, a Class A misdemeanor" and that the offense is a level 6 felony if the value of the property is at least $750 and less than $50,000. (Subsequently amended by Pub. L. No. 166-2017 § 2 (eff. July 1, 2017)). The State alleged H.J. knowingly or intentionally exerted unauthorized control over Rogers's property, namely, a laptop computer, a cell phone, and a purse and its contents including a wallet, prescription medication, and currency, with the intent to deprive Rogers of its value or use, in an amount greater than $750 and less than $50,000. Ind. Code § 35-43-4-2.5 provided at the time of the offenses that "[a] person who knowingly or intentionally exerts unauthorized control over the motor vehicle of another person, with intent to deprive the owner of . . . the vehicle's value or use . . . commits auto theft, a Level 6 felony." (Subsequently amended by Pub. L. No. 252-2017 § 14 (eff. July 1, 2017)). The State alleged H.J. knowingly or intentionally exerted unauthorized control over Rogers's vehicle with the intent to deprive her of its value or use.

[18] H.J. argues that the trial court abused its discretion in denying his motion to dismiss, that the taped statements withheld by Detective Kern were shown to contain evidence affecting his credibility and the alibi witnesses, that the State

had a duty to disclose the recorded statements under *Brady v. Maryland*, 373 U.S. 83 (1963), and that the bifurcation or continuance was not an adequate remedy for the *Brady* violation. H.J. further contends that the State failed to rebut his alibi defense beyond a reasonable doubt because it failed to investigate or preserve evidence that would have exonerated him and that, contrary to his testimony on the first day of the denial hearing, Detective Kern was aware of both co-defendants' alibi defenses when he first spoke with them.

[19] The State maintains the court properly denied H.J.'s motion to dismiss, the court granted H.J.'s request to continue the proceedings so that the recordings could be reviewed, and that, because the recordings were revealed to H.J. during the proceedings, H.J. cannot establish a *Brady* violation. The State further maintains the evidence was sufficient to sustain H.J.'s adjudication and that Detective Kern's failure to attempt to review surveillance footage from Incrediplex does not render the factfinder's rejection of H.J.'s alibi defense invalid. It states that no evidence was offered showing surveillance footage from Incrediplex would have been available by the time H.J.'s mother and cousin first claimed that H.J. had been at Incrediplex, and that the factfinder had the opportunity to take the fact that Detective Kern had not sought surveillance footage from Incrediplex into account in considering the evidence.

[20] "While the mere unexplained possession of recently stolen property standing alone does not automatically support a conviction for theft, such possession is to be considered along with the other evidence in a case, such as how recent or distant in time was the possession from the moment the item was stolen, and

what are the circumstances of the possession (say, possessing right next door as opposed to many miles away)." *Holloway v. State*, 983 N.E.2d 1175, 1179 (Ind. Ct. App. 2013) (citations and internal quotation marks omitted). The fact of possession and all the surrounding evidence about the possession must be assessed to determine whether any rational trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.* (citing *Girdler v. State*, 932 N.E.2d 769, 773 (Ind. Ct. App. 2010) (noting that possession of recently stolen property is to be considered along with the other evidence in a case and the circumstances of the possession)). The trier of fact must assess all of the evidence instead of focusing upon one piece of evidence, such as possession of recently stolen property. *Id.* Further, it is well-settled that a defendant may be charged with and convicted of theft or auto theft, even if the person was not the original thief, so long as the elements of the offense are met. *See Girdler*, 932 N.E.2d at 771; *see also Donovan v. State*, 937 N.E.2d 1223, 1226 (Ind. Ct. App. 2010) (concluding the State was not required to show that the defendant had exclusive possession of the vehicle from the time of the theft to the time of his arrest but rather the trier of fact should look at all of the evidence to determine if the defendant is guilty of the offense beyond a reasonable doubt), *trans. denied*.

[21] In addition, the State is not required to rebut directly a defendant's alibi but may disprove the alibi by proving its own case-in-chief beyond a reasonable doubt. *Carr v. State*, 728 N.E.2d 125, 130 (Ind. 2000). A factfinder may disbelieve alibi witnesses if the State's evidence makes such disbelief reasonable. *Id.* (citing *Lambert v. State*, 516 N.E.2d 16, 19 (Ind. 1987) ("We cannot

substitute our appellate impressions for such jury credibility determinations. It was the jury's role to evaluate the evidence and the testimony of witnesses, and the jury was entitled to find against the defendant despite his alibi evidence.").

[22] The record reveals Rogers's in-court identification of H.J. as the male juvenile she observed driving her vehicle out of the gas station parking lot. Rogers indicated that, when she observed the vehicle leaving the parking lot, she was "not too far that I couldn't see their face." Transcript Volume II at 15. She also testified that she observed the juveniles when she exited her vehicle because "they were right in front of my truck." *Id.* at 16. Further Rogers testified that "days later" she obtained a replacement phone at which time she discovered that photographs had been taken using her stolen phone and that two of the photographs depicted the individuals, including H.J., who had taken her vehicle. *Id.* at 17. Rogers observed that a number of persons were shown in the photographs taken using her stolen phone, she specifically recognized the two individuals she saw at the gas station, and there were not any other children at the gas station. The prosecutor and defense counsel thoroughly examined and cross-examined Rogers and the other witnesses. The court was able to assess the testimony of Rogers, Anderson, and Detective Kern and their credibility. The evidence of the discovery of the photographs of H.J. which had been taken using Rogers's phone, the proximity in time between the thefts and the discovery of the photographs, and the unequivocal in-court identification testimony of Rogers at the denial hearing, together, is evidence from which the court as factfinder reasonably could have concluded that H.J. exerted

unauthorized control over Rogers's vehicle and property with intent to deprive her of their value or use. Based upon our review of the facts most favorable to the adjudication, we conclude that evidence of probative value exists from which a reasonable factfinder could find beyond a reasonable doubt that H.J. committed delinquent acts constituting theft and auto theft if committed by an adult.

[23] Further, to the extent H.J. argues that the trial court abused its discretion in denying his motion to dismiss on the basis that the State or Detective Kern failed to disclose recorded statements, we observe that under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963), the State has an affirmative duty to disclose material evidence favorable to the defendant. *State v. Hollin*, 970 N.E.2d 147, 153 (Ind. 2012). To establish a *Brady* violation, a defendant must show (1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the defense; and (3) that the evidence was material to an issue at trial. *Stephenson v. State*, 864 N.E.2d 1022, 1056-1057 (Ind. 2007), *reh'g denied*, *cert. denied*, 522 U.S. 1314 (2008). The Indiana Supreme Court has observed that, "[i]f the favorable evidence becomes known to the defendant before or during the course of a trial, *Brady* is not implicated." *Williams v. State*, 714 N.E.2d 644, 649 (Ind. 1999) (citing *Braswell v. State,* 550 N.E.2d 1280, 1283 (Ind. 1990) ("[I]n the instant case, the discovery of the recorded statement occurred before the trial concluded. Thus appellant's reliance on *Brady* is misplaced.")), *cert. denied*, 528 U.S. 1170 (2000). Here, H.J. requested a bifurcation or continuance so that the recorded conversations between Detective Kern and those he interviewed could

be obtained and reviewed, the court granted his request and scheduled a hearing for June 28, 2016, and his counsel thoroughly cross-examined Detective Kern at the June 28, 2016 hearing regarding his investigation and the contents of the recorded statements. H.J. had an opportunity to review the recordings prior to the June 28, 2016 hearing, *Brady* was not implicated, and the trial court did not abuse its discretion in denying H.J.'s request to dismiss.

## *Conclusion*

[24] For the foregoing reasons, we affirm H.J.'s adjudication as delinquent for committing acts that would constitute auto theft and theft as level 6 felonies if committed by an adult.

[25] Affirmed.

May, J., and Pyle, J., concur.