# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 15 2016, 10:03 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kristina J. Jacobucci
Newby Lewis Kaminski & Jones, LLP
LaPorte, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

## IN THE
## COURT OF APPEALS OF INDIANA

| | |
|---|---|
| William McGrath, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | June 15, 2016 <br><br> Court of Appeals Cause No. 46A04-1504-CR-277 <br><br> Appeal from the LaPorte Circuit Court <br><br> The Honorable Thomas Alevizos, Judge <br><br> Trial Court Cause No. 46C01-1309-FB-305 |

**Barnes, Judge.**

# Case Summary

[1] William McGrath appeals his convictions for Class B felony attempted rape, Class B felony aggravated battery, Class C felony sexual battery, Class C felony battery resulting in serious bodily injury, Class D felony intimidation, and Class D felony strangulation. We affirm in part and reverse in part.

# Issues

[2] McGrath raises the following issues for our review:

> I. whether the State committed prosecutorial misconduct by referring to McGrath's purported silence during an interview with police;
>
> II. whether there is sufficient evidence to support his convictions; and
>
> III. whether McGrath's convictions for aggravated battery, battery resulting in serious bodily injury, and sexual battery violate double jeopardy principles.

# Facts

[3] The evidence most favorable to the convictions is that, at approximately 4:45 a.m. on September 22, 2013, McGrath went to the LaPorte home of an acquaintance, M.F., and rang her doorbell. McGrath told M.F. that he was drunk and needed a place to stay for a few hours, and M.F. reluctantly allowed McGrath inside. M.F. tried to get McGrath to lie down on her couch, but he

insisted on lying on her bed. M.F. finally allowed him to do so while she took a shower and got ready for the day.

[4] At about 7:30 a.m., M.F. went into her bedroom to tell McGrath that he needed to leave because she was leaving soon. As M.F. began to shake McGrath's arm to wake him, he grabbed M.F.'s arms and dragged her across the bed and pulled her on top of him while he held her. M.F. said "don't rape me" repeatedly. Tr. p. 360. McGrath released her temporarily, and she rolled off the bed onto the floor and onto her back. McGrath then sat on top of M.F. and pinned her to the floor with her arms above her head. McGrath put his hand under M.F.'s neck and forced her to turn her head to the left and held it with such force that she struggled to breathe, although McGrath did not put his hands on her throat. McGrath also punched M.F. two or three times in the face and said to her, "If you move I will kill you." *Id.* at 362.

[5] McGrath then allowed M.F. to free her arms, pulled down his underwear, and demanded that she stroke his penis until he became erect. M.F. was wearing an ankle-length gown and house coat. At no point did McGrath say he wanted to perform any other sex acts with M.F., nor did he attempt to penetrate her or touch her or remove her gown. After M.F. had fondled McGrath's penis for five to eight minutes, he still was not erect, and M.F. told him someone would be coming to pick her up soon to go to an auction. At this time, around 7:50 a.m., McGrath got up and began getting dressed, saying he had to go to work. He allowed M.F. to get dressed and left the house while she was doing so. M.F. left the house at about 8:15 a.m.

[6]     M.F. did not immediately report the incident to police or call 911.  She also did not tell the friend who picked her up at the house what had happened, nor other people she saw that day at the auction she attended, despite the noticeable bruising on her face and questions as to what had happened.  M.F. would later tell some acquaintances that she had injured herself falling down the stairs.  At about 4:30 p.m., M.F. finally allowed a friend to drive her to the emergency room.  M.F. had extensive bruising on her face and left hand and the bridge of her nose was fractured.  M.F. also spoke with police at the hospital about the attack and indicated she may have engaged in some consensual hugging and kissing with McGrath on an earlier date.  No rape kit was performed.  McGrath's DNA later was discovered on M.F.'s bedsheets.  During an interview with police, after McGrath had been advised of his right to remain silent, he was asked if he had ever visited M.F. at her residence and he responded, "let me think about it.  I've been really busy." *Id.* at 527.

[7]     M.F. injured her left thumb during the altercation with McGrath.  Due to a completely torn ligament in the thumb, M.F. was unable to grip anything with it "because it just flopped." *Id.* at 391.  The precise nature of M.F.'s injury was not determined until November 12, 2013, after which M.F. underwent surgery.  M.F.'s thumb was in a cast for six to seven weeks after surgery, and thereafter she could not use the thumb until June 1, 2014, while it continued healing.

[8]     The State charged McGrath with Class B felony attempted rape, Class B felony aggravated battery, Class C felony sexual battery, Class C felony battery resulting in serious bodily injury, Class D felony intimidation, and Class D

felony strangulation.[1]  During closing argument, the prosecutor referred to McGrath's evasive statement in response to the question of whether he had ever been to M.F.'s apartment and said,

> And he never answers that question.  He avoids it.  What does that tell you, if you have to avoid a question?  You really don't want to tell the truth about it.  He just avoids it.

> Well, let me think.  I've been working so much.  Those are the answers he's giving.  It was just a week earlier that he would have been at her house just having coffee, pop, watching TV.  He couldn't say, well, I did meet this lady and that same day I remember calling her, went over to her house.  Why not offer that up?  Because, again at this point he doesn't know what the acquisition [sic] is.  Again, it could have been something as simple as, well, you know, you bumped her bar out in front of her house.  Who knows?  It could have been something as simple as that.

*Id.* at 698-99.  At this point, defense counsel approached the bench and said, "Judge, I think we're starting to get right to the right to remain silent."  *Id.* at 699.  The trial court told the prosecutor, "Be careful there."  *Id.*  Defense counsel did not request that the jury be admonished or request a mistrial, and the prosecutor resumed closing argument.

[9]     The jury found McGrath guilty of all six counts as charged.  The trial court entered judgments of conviction and imposed sentences for all counts, despite

---

[1] The original charging information alleged that McGrath had threatened to kill M.F. if he did not have sex with her; this allegation later was removed in an amended charging information.

the State conceding that the sexual battery charge could be merged with the other offenses. McGrath now appeals.

# Analysis

## I. Prosecutorial Misconduct

[10] We first address McGrath's claim that the State committed misconduct during closing argument by referring to his statement during police questioning, "let me think about it," when asked whether he had ever been to M.F.'s residence. Tr. p. 527. When faced with a claim of prosecutorial misconduct, we must determine: (1) whether misconduct occurred; and if so, (2) whether the misconduct placed the defendant in a position of grave peril to which he or she should not have been subjected in light of all the circumstances. *Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014). We measure whether a prosecutor's argument amounted to misconduct by referring to case law and the Rules of Professional Conduct. *Id.* The gravity of peril is measured by the probable persuasive effect of misconduct on a jury, rather the degree of impropriety of the conduct. *Id.* "To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial." *Id.*

[11] If a defendant fails to preserve a claim of prosecutorial misconduct, he or she must establish not only the grounds for prosecutorial misconduct, but also that the misconduct amounted to fundamental error. *Id.* "Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the

heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to 'make a fair trial impossible.'" *Id.* (quoting *Benson v. State*, 762 N.E.2d 748, 756 (Ind. 2002)). The defendant must show the trial court erred in not sua sponte raising an issue because it constituted a clearly blatant violation of basic and elementary principles of due process, and the error presented an undeniable and substantial potential for harm. *Id.* In evaluating a claim of fundamental error, we must consider the alleged misconduct in light of all that happened and all relevant information given to a jury, including evidence admitted at trial, closing argument, and jury instructions. *Id.*

[12] Here, McGrath acknowledges that trial counsel failed to properly preserve any claim of prosecutorial misconduct for appeal. Although trial counsel interrupted the State's closing argument to raise concerns about comments on McGrath's right to remain silent, counsel neither requested an admonishment to the jury nor a mistrial. Thus, McGrath must establish that the prosecutor's closing argument amounted to fundamental error.

[13] McGrath has not met that burden. It is clear under the Fifth and Fourteenth Amendments to the United States Constitution that the prosecution cannot comment on a defendant's decision not to testify at trial. *Owens v. State*, 937 N.E.2d 880, 886 (Ind. Ct. App. 2010) (citing *Griffin v. California*, 380 U.S. 609, 614, 85 S. Ct. 1229, 1232 (1965)), *trans. denied*. Similarly, the prosecution cannot use a defendant's post-arrest, post-*Miranda* silence to impeach a defendant. *Id.* (citing *Doyle v. Ohio*, 426 U.S. 610, 617-18, 96 S. Ct. 2240, 2244-

45 (1976)).  There is a split of authority in the federal courts as to the propriety of the prosecution referring to a defendant's pre-arrest silence.  *See id.* at 887-889.  After carefully reviewing cases on both sides, this court has held that it violates the Fifth Amendment for the prosecution to make substantive use of a defendant's pre-arrest silence against the defendant.  *Id.* at 891.

[14]  In order to be entitled to the protection of the Fifth Amendment's right to silence, a defendant must clearly invoke that right.  *Id.* at 891-92.  "An assertion of the Miranda right to remain silent must be clear and unequivocal."  *Wilkes v. State*, 917 N.E.2d 675, 682 (Ind. 2009), *cert. denied*.  "Mere expressions of reluctance to talk do not invoke the right to remain silent."  *Id.*  Raising doubts or expressing concern about speaking followed by continued dialogue do not unambiguously assert the right to remain silent.  *Id.*

[15]  Here, McGrath commented to police during a pre-arrest interview, "let me think about it," when asked whether he had ever been to M.F.'s house.  Tr. p. 527.  It was this evasive answer to which the State was referring during its closing argument.  This was not a clear invocation by McGrath of his right to remain silent, and McGrath does not direct us to any other statements prior to this one indicating he had invoked that right.  Referring to that statement and expounding upon it did not clearly violate McGrath's Fifth Amendment right to remain silent.

[16]  McGrath nonetheless argues that the State was referring in closing argument not only to his police interrogation, but also his decision not to testify during

trial. In addition to being prohibited from directly commenting upon a defendant's decision not to testify, the prosecution also cannot indirectly do so by indicating that the defendant failed to controvert the State's evidence. *See id.* at 893-94 (citing *Davis v. State*, 685 N.E.2d 1095, 1098 (Ind. Ct. App. 1997)). To the extent the prosecutor here began to approach this line in commenting on McGrath's evasion of the question of whether he had ever been to M.F.'s house, trial counsel interrupted the argument and prevented the crossing of that line. In any case, there was no clear violation of McGrath's right not to testify that could amount to fundamental error. This is particularly true in light of M.F.'s testimony identifying McGrath as her assailant and that the prosecutor's comments were relatively brief in comparison to the remainder of her argument, as well as instructions given to the jury.

## II. Sufficiency of the Evidence

[17] Next, we address McGrath's challenge to the sufficiency of the evidence supporting his convictions. In conducting such a review, we must consider only the probative evidence and reasonable inferences therefrom supporting the verdict. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). "It is the fact-finder's role, not that of appellate courts, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction." *Id.* We will affirm unless no reasonable fact-finder could have found the elements of the crime proven beyond a reasonable doubt. *Id.* The evidence need not overcome every reasonable hypothesis of innocence. *Id.*

### *A. Identity*

[18]  McGrath first claims there is insufficient evidence to identify him as M.F.'s assailant and, therefore, all of his convictions should be reversed. He contends M.F.'s testimony was incredibly dubious and that an alibi witness placed him at his residence and not M.F.'s residence at the time of the attack. Regarding the incredible dubiosity claim, an appellate court may impinge upon the fact-finder's responsibility to judge the credibility of witnesses, but only if confronted with inherently improbable testimony or coerced, equivocal, and wholly uncorroborated testimony of incredible dubiosity. *Moore v. State*, 27 N.E.3d 749, 755 (Ind. 2015). Application of the rule is limited to instances where: (1) there is a sole testifying witness; (2) the testimony is inherently contradictory, equivocal, or the result of coercion; and (3) there is a complete absence of circumstantial evidence. *Id.* at 756. "The fact that a witness gives trial testimony that contradicts earlier pre-trial statements does not necessarily render the trial testimony incredibly dubious." *Murray v. State*, 761 N.E.2d 406, 409 (Ind. 2002).

[19]  McGrath primarily directs us to purported inconsistencies between M.F.'s trial testimony and statements she made before trial. For example, McGrath notes that M.F. failed to seek any medical attention for injuries for several hours after the incident occurred and that she gave varying explanations to police as to why she waited so long, and also gave differing stories to other persons regarding how she had sustained her injuries, such as by falling down the stairs. Embarrassment or shock over what occurred all too often inhibits a sexual

assault victim from being completely truthful about what happened with everyone he or she talks to, or leads to a delay in reporting what happened to authorities. Other alleged inconsistencies McGrath notes are inconsequential, such as whether she and McGrath had ever previously hugged and kissed and whether she went to work after the attack occurred or went to an auction. McGrath also points out that, in the original charging information, the State alleged that McGrath had threatened to kill M.F. if she did not have sex with him, while in the amended information the threat regarding sex was not mentioned, nor did M.F. mention any such threat at trial. The charging information was amended and reflected the evidence presented. McGrath has no legal basis to quibble here.

[20] M.F.'s actual trial testimony was clear, unequivocal, and uncoerced with respect to identifying McGrath as her assailant and what he did to her. This case is unlike *Gaddis v. State*, 253 Ind. 73, 251 N.E.2d 658 (1969). In *Gaddis*, our supreme court reversed a robbery conviction where the single eyewitness to the crime vacillated at trial regarding his identification of the defendant, there was evidence of coercion by both the police and the defendant, and there was a lack of circumstantial evidence corroborating the witness's testimony. *Gaddis*, 253 Ind. at 80-81, 251 N.E.2d at 661-62. M.F.'s testimony was not at all like the witness's in *Gaddis*; her testimony does not fall within the parameters of the incredible dubiosity rule. Additionally, there was some circumstantial evidence tying McGrath to the assault, including his DNA on M.F.'s bedsheets. Any

discrepancies regarding M.F.'s testimony was for the jury to weigh and consider.

[21] We now address McGrath's contention regarding his alibi defense.[2] "The State is not required to rebut directly a defendant's alibi but may disprove the alibi by proving its own case-in-chief beyond a reasonable doubt." *Carr v. State*, 728 N.E.2d 125, 130 (Ind. 2000). A fact-finder may reject alibi witnesses if the State's evidence makes such rejection reasonable. *Id.*

[22] At trial, McGrath called Steve Burgess, his landlord, neighbor, and long-time friend, to testify that he recalled seeing McGrath's vehicle outside his (McGrath's) residence at about 7:50 a.m., and recalled seeing McGrath in person at around 8:15 to 8:30 a.m., on September 22, 2013.[3] Burgess also testified that McGrath never went anywhere without his vehicle. An officer who drove between M.F.'s and McGrath's residence testified that it took eleven minutes to do so. McGrath insists that Burgess's testimony discredits M.F.'s timeline of events, given that she said McGrath did not stop his attack until 7:50 a.m. and left her home sometime thereafter.

[23] We believe any discrepancies between Burgess and M.F. were a matter for the jury to resolve. Certainly, the jury was entitled to believe that either M.F. or

---

[2] The State failed to address this argument in its brief.

[3] The witness's testimony originally was that he saw McGrath around 8:15 but on redirect the witness stated that it was "[a]round 8:30." Tr. p. 668.

Burgess were slightly mistaken in their recollection of precisely what they saw and what occurred when. We also note that Burgess's recollection of when he saw McGrath in person is consistent with M.F.'s recollection of when McGrath ended the attack and left her residence. The jury also was not mandated to believe Burgess's testimony over M.F.'s. The State's own evidence would disprove Burgess's version of events, and the jury was entitled to accept that M.F. had a better recollection of the morning of September 22, 2013, and the timing of McGrath's assault. There is sufficient evidence to identify McGrath as M.F.'s assailant.

## B. Attempted Rape

[24] Next, McGrath argues that, even if he was M.F.'s assailant, there is insufficient evidence to convict him of attempted rape. At the time of the offense, Indiana Code Section 35-42-4-1(a)(1) provided that a person who knowingly or intentionally has sexual intercourse with a member of the opposite sex when the other person is compelled by force or imminent threat of force commits Class B felony rape.[4] "'Sexual intercourse' means an act that includes any penetration of the female sex organ by the male sex organ." Ind. Code § 35-31.5-2-302. "A person attempts to commit a crime when, acting with culpability required for commission of the crime, the person engages in conduct that constitutes a substantial step toward commission of the crime." I.C. § 35-

---

[4] Currently, Indiana Code Section 35-42-4-1 classifies rape as a Level 3 felony, and includes forcibly committing "other sexual conduct" in addition to sexual intercourse. "Other sexual conduct" includes oral and anal sex, or penetrating the sex organ or anus of a person with an object. Ind. Code § 35-31.5-2-221.5.

41-5-1(a). Thus, in order to convict McGrath of Class B felony attempted rape as charged, the State was required to prove that he knowingly or intentionally took a substantial step toward having sexual intercourse with M.F. while she was compelled by force or imminent threat of force. *See Oeth v. State*, 775 N.E.2d 696, 700 (Ind. Ct. App. 2002), *trans. denied*. "What constitutes a 'substantial step' toward the commission of a crime is dependent upon the facts of the case, but the requirement is a minimal one and is often defined as any overt act in furtherance of the crime." *Id.*

[25] Here, McGrath argues there is no evidence that he ever stated an intention to have sexual intercourse with M.F., no evidence that he ever actually attempted to penetrate her, no evidence that he attempted to disrobe her, and no evidence that he touched her sexually; he only demanded that she masturbate his penis and she stopped doing so after several minutes when he failed to become erect. Regardless, both our supreme court and this court have affirmed convictions for attempted rape in the absence of any evidence of a stated intention to have sexual intercourse with the victim, any attempt at actual penetration, or any attempt to disrobe the victim.

[26] In *Underwood v. State*, 515 N.E.2d 503 (Ind. 1987), our supreme court affirmed an attempted rape conviction with less evidence of overt sexual conduct than occurred here. In *Underwood*, the defendant grabbed the victim by the throat as she was jogging and held a knife to her face and demanded that the victim come with him. After a struggle, he dragged her into the woods, sat on top of her, stabbed her hand, and punched her in the face. The victim managed to get up,

and the defendant first grabbed her hair, then pulled on her shorts as she attempted to get away; she finally managed to escape after punching him in the groin. There was no evidence the defendant ever stated his intention to have sex with the victim. Our supreme court concluded, "it was for the jury to weigh the pertinent facts . . . and to determine whether or not there was competent evidence beyond a reasonable doubt that appellant intended his attack to culminate in the rape of the victim." *Underwood*, 515 N.E.2d at 507.

[27] Similarly, in *Tatum v. State*, 485 N.E.2d 138 (Ind. Ct. App. 1985), *trans. denied*, this court affirmed an attempted rape conviction where the defendant went into a thirteen-year-old's bedroom, sat on top of her, pushed her shoulders down, and put his hand over her mouth, then ran out of the room with his pants down after the victim kicked him. We observed:

> The fact that a defendant may not attempt to, or is ultimately unsuccessful in, removing his victim's clothing, removing his own clothing, or removing his penis from his clothing does not lead to the conclusion that such defendant lacked the requisite intent or that he did not take a substantial step toward committing the offense of rape. Moreover, the fact that a defendant does not specifically inform his victim of his intent to rape her, or the fact that a defendant does not actually attempt penetration does not render the evidence insufficient.

*Tatum*, 485 N.E.2d at 139.

[28] In light of cases such as *Underwood* and *Tatum*, we cannot say there was insufficient evidence to convict McGrath of Class B felony attempted rape. Given the manner of McGrath's attack upon M.F., the jury reasonably could

have concluded that he would have attempted to have sexual intercourse with her if he had become erect. We affirm McGrath's conviction on this count.

### C. *Aggravated Battery*

[29] McGrath also contends there is insufficient evidence he injured M.F.'s thumb during the attack on September 22, 2013, or that such injury was serious enough to warrant a Class B felony aggravated battery conviction. On the date of the offense, a person was guilty of Class B felony aggravated battery if he or she knowingly or intentionally inflicted injury on a person that caused protracted loss or impairment of the function of a bodily member or organ. I.C. § 35-42-2-1.5(2) (2013).[5] "'[P]rotracted' means to 'draw out or lengthen in time,' and . . . 'impairment' means the 'fact or state of being damaged, weakened, or diminished.'" *Grundy v. State*, 38 N.E.3d 675, 682 (Ind. Ct. App. 2015) (quoting *Mann v. State*, 895 N.E.2d 119, 122 (Ind. Ct. App. 2008)), *trans. denied*. "Expert testimony is not required to prove that a victim suffered a protracted impairment." *Id.* We generally exercise great deference to the fact-finder when it comes to questions of the severity of an injury, though such deference is not absolute. *Mendenhall v. State*, 963 N.E.2d 553, 569 (Ind. Ct. App. 2012), *trans. denied*.

[30] We first conclude there is sufficient evidence that M.F. sustained her left thumb injury during the assault McGrath committed. McGrath focuses on the fact

---

[5] Aggravated battery is now classified as a Level 3 felony.

that M.F. did not seek medical treatment for her thumb until several weeks after the attack. However, M.F. testified that during the attack, McGrath held her hands tight above her head and that her left hand hurt immediately afterwards. It was noted during McGrath's emergency room visit that her left hand was very bruised, swollen, and painful. And, although an x-ray at the time failed to reveal any fractures in her thumb, there is no evidence that the x-ray necessarily would have revealed a torn ligament. The emergency room nurse testified that she was not surprised to learn that M.F. had a torn thumb ligament, and indeed it would have been difficult to diagnose such a tear at the time of her emergency room visit. McGrath speculates that it is possible M.F. injured her thumb sometime before or after the assault. There is no evidence of any other incident in which M.F. could have injured her thumb; for us to accept McGrath's speculation that she could have sustained the injury at a different time is an invitation to reweigh the evidence, which we must refuse. The evidence is sufficient that McGrath injured M.F.'s thumb.

[31] We also reject McGrath's argument that the thumb injury did not amount to the protracted loss or impairment of a bodily member. M.F. described how she was unable to grip anything using her left thumb for months because it was basically useless, both before she had surgery on the thumb and for months afterward. It should be self-evident that the loss of one's thumb and the ability to grip items using it is a substantial impairment not only of the thumb, but of the whole hand. M.F. suffered from such impairment for months; indeed, she testified at trial that her thumb still was not completely normal. In light of this

evidence, we decline to reverse the jury's determination that M.F. suffered a sufficient injury so as to sustain McGrath's conviction for Class B felony aggravated battery.

### D. Strangulation

[32]    Finally, McGrath argues there is insufficient evidence to support his conviction for strangulation. In order to convict McGrath of Class D felony strangulation as charged, the State was required to prove that he, in a rude, angry, or insolent manner, knowingly or intentionally applied pressure to M.F.'s throat or neck in a manner that impeded her normal breathing or blood circulation. *See* I.C. § 35-42-2-9 (2013).[6]

[33]    McGrath asserts that M.F.'s testimony was vague as to whether he actually choked her or put his hands around her neck. Indeed, it does not appear that McGrath actually choked M.F. by putting his hands around her neck. However, the strangulation statute does not limit the methods a defendant may use in order to cut off another person's breathing. It prohibits *any* rude, insolent, or angry application of pressure to the throat or neck of another person that impedes normal breathing. Here, although it is unclear exactly where and how McGrath placed his arms and hands,[7] M.F.'s testimony was clear that he placed her in a "headlock" that twisted her neck to such a degree that she could

---

[6] Strangulation is now a Level 6 felony.

[7] M.F. apparently gave a visual demonstration to the jury of how McGrath applied pressure to her neck, which we cannot see.

not breathe and was gasping for air. Tr. p. 362. It is evident that the purpose of the strangulation statute is to penalize the extremely dangerous act of cutting off a person's breathing. McGrath did that to M.F. There is sufficient evidence to support his conviction for Class D felony strangulation.

### III. Double Jeopardy

The final issue is whether McGrath's convictions for Class B felony aggravated battery, Class C felony battery resulting in serious bodily injury, and Class C felony sexual battery violate double jeopardy principles. Convictions for two or more offenses violate the Double Jeopardy Clause of the Indiana Constitution if, "'with respect to either the statutory elements of the challenged crimes or the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense.'" *Sistrunk v. State*, 36 N.E.3d 1051, 1053 (Ind. 2015) (quoting *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999)).

In addition, even if the constitutional double jeopardy rule is not violated, Indiana law may nevertheless prohibit convictions for multiple offenses under certain rules of statutory interpretation and common law. *Id.* Among the non-constitutional situations in which multiple convictions are barred include conviction and punishment for a lesser-included offense of another crime for which the defendant has been convicted and punished; and conviction and punishment for a crime consisting of the very same act as another crime for which the defendant has been convicted and punished. *Vandergriff v. State*, 812

N.E.2d 1084, 1088 (Ind. Ct. App. 2004) (quoting *Richardson*, 717 N.E.2d at 55-56 (Sullivan, J., concurring)), *trans. denied*.

[36] In order to convict McGrath of aggravated battery as charged, the State was required to prove that he knowingly or intentionally inflicted injury on M.F. that caused protracted loss or impairment of the function of a bodily member or organ. *See* I.C. § 35-42-2-1.5(2) (2013). As noted, the particular injury the State relied on to prove this charge was the injury to M.F.'s left thumb. In order to convict McGrath of Class C felony battery, the State was required to prove that he knowingly or intentionally touched M.F. in a rude, insolent, or angry manner, and that such touching resulted in serious bodily injury to M.F. *See* I.C. § 35-42-2-1(a)(3) (2013). To convict McGrath of Class C felony sexual battery, the State was required to prove that he touched M.F. with the intent to arouse his own or another person's sexual desires, that he compelled M.F. to submit to the touching by force or the imminent threat of force, and that such threat included the threat of deadly force. *See* I.C. § 35-42-4-8 (2013).

[37] Here, the State concedes that it violates double jeopardy principles to convict McGrath of aggravated battery, battery resulting in serious bodily injury, and sexual battery. The assault upon M.F. was one continuous incident that was sexual in nature, and the primary serious bodily injury relied upon by the State was the one to M.F.'s left thumb. In accordance with the State's concession, we direct that the convictions with the less severe penal consequences—Class C

felony battery and Class C felony sexual battery—be vacated.[8] *See Richardson*, 717 N.E.2d at 55.

## Conclusion

[38] The State's reference to McGrath's evasive answer to a question during police interrogation did not constitute fundamentally erroneous prosecutorial misconduct. There is sufficient evidence to support all of McGrath's convictions. However, his convictions for Class C felony battery resulting in serious bodily injury and Class C felony sexual battery must be vacated on double jeopardy grounds.

[39] Affirmed in part and reversed in part.

Vaidik, C.J., and Mathias, J., concur.

---

[8] Because McGrath's sentences all were ordered to be served concurrently, his aggregate sentence will not be affected by vacation of these offenses. The imposition of concurrent sentences does not cure a double jeopardy violation, however. *Hines v. State*, 30 N.E.3d 1216, 1221 (Ind. 2015).